UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMY RUFF, Individually, and as Natural Parent of BRAYLEY RUFF, a Minor, | |
| Plaintiffs, | |
| | CIVIL ACTION |
| v. | FILE NO.:  __2:22-CV-064-RWS___ |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## COMPLAINT FOR DAMAGES

Amy Ruff, on behalf of herself and her minor daughter, Brayley Ruff, files her Complaint for Damages against Ford Motor Company, showing the Court as follows:

### PARTIES, JURISDICTION AND VENUE

1.

This is a renewal action filed pursuant to O.C.G.A. § 9-2-61 and the cases interpreting it. *See Belcher v. Folsom*, 258 Ga. App. 191 (2002).

2.

The Original Action was filed in the Superior Court of Madison County, Georgia (Case No. 20MV00143), and was subsequently transferred to Superior Court of Barrow County, Georgia (Case No. 20-CV-000756-M).

3.

Service of process was properly perfected against each and every Defendant in the Original Action, including Ford Motor Company.

4.

All court costs in the Original Action have been paid as required by O.C.G.A. § 9-11-41(d).

5.

The Original Action involved the same party, the same claims, and was a valid action that may be renewed under O.C.G.A. § 9-2-61.

6.

The Original Action was not dismissed on its merits. As such, this renewal action is not the renewal of an action dismissed on its merits.

7.

The Original Action was dismissed without prejudice by Plaintiffs on March 28, 2022.

8.

This renewal action is filed within six months of Plaintiff's voluntary dismissal without prejudice of the previous action.

9.

This renewal is brought against a party that was a party to the previous action, and it involves claims that were all raised in the previous action.

10.

Amy Ruff and her minor daughter Brayley are residents of, citizens of, and are domiciled in Madison County, Georgia.

11.

Ford Motor Company is a corporation with its principal place of business located at 1 American Road, Dearborn, Michigan, 48126. Ford's registered agent for service of process is The Corporation Company, 40600 Ann Arbor Rd. E, Suite 201, Plymouth, Michigan, 48170. When said agent is served with copies of the Summons and Complaint in this matter, Ford will be subject to the jurisdiction and venue of this Court. Ford has been properly served in this matter.

## **THE PRODUCT**

### 12.

The vehicle at issue is a 2018 Ford F-150 Supercrew King Ranch pickup truck, VIN 1FTEW1EG0JFC85927 ("Subject Vehicle").

### 13.

The Subject Vehicle was purchased as new from Akins Ford on November 24, 2018. At the time of the incident described herein, the Subject Vehicle had traveled a mere 26,510.5 miles.

## **THE INCIDENT**

### 14.

On December 28, 2019, Plaintiff Amy Ruff was preparing to leave her home with Mr. Ruff, and their minor child, Plaintiff Brayley Ruff.

### 15.

Mr. Ruff used the Subject Vehicle's key fob to start the truck engine remotely from inside their home.

### 16.

The truck was parked in their driveway on the side of their home, parallel to the garage and facing towards the backyard on a slight decline where it had been sitting overnight.

17.

Amy Ruff entered the subject vehicle shortly after the remote start and was seated in the front passenger seat, while Brayley entered the vehicle and sat in the rear driver's side seat. Mr. Ruff returned inside of the home to gather some belongings.

18.

While sitting in the parked truck with Brayley, waiting for Mr. Ruff to gather his belongings, the Subject Vehicle began to roll forward down the driveway towards the backyard.

19.

As the Subject Vehicle traveled down their driveway, it soon reached a significantly steeper decline, where it quickly picked up speed.

20.

With no one at the steering wheel, or even in the driver's seat, the Subject Vehicle traveled in an uncontrolled manner downhill, partially left their driveway, and glanced off of a nearby tree before colliding head-on with another tree, coming to an immediate and violent stop.

21.

The front passenger airbag did not deploy during the collision, resulting in Amy Ruff being thrown headfirst into the Subject Vehicles' windshield, and being seriously injured as a result.

22.

Brayley, the minor child, was seated in the back seat on the driver's side and was thrown into the back of the driver's seat, causing her injuries.

## DEFECT

### The Subject Vehicle was in Park

23.

The Subject Vehicle was in Park when Mr. Ruff started the vehicle, while inside the home, using his key fob and the remote start feature of the Vehicle.

24.

Ford designed the Subject Vehicle in such a way that it should not be able to be started unless and until it is in Park.

25.

Had the Subject Vehicle not been in Park, Mr. Ruff would not have been able to start the vehicle.

## Shifting Out of Park Shouldn't Occur Without Certain Requirements

26.

Ford designed the Subject Vehicle in such a way that, if it is properly manufactured, it should not be able to be shifted out Park unless and until the following things occur:

(a)     A person is sitting in the driver's seat;

(b)     The brake pedal is depressed;

(c)     The shift lever button is depressed; and

(d)     The shift lever is maneuvered out of the Park position and into another position.

27.

All of the circumstances described in paragraph 15 must be present—together and at the same time—in order for a properly designed and properly manufactured 2018 Ford F-150 Supercrew King Ranch pickup truck to be shifted out of Park.

28.

If all of the circumstances in paragraph 15 are not present—together and at the same time—the Subject Vehicle should not be able to be shifted out of Park, even if the shift lever is contacted by a vehicle occupant.

## No One Opened the Driver's Door

29.

From the time that Mr. Ruff started the vehicle, until the time that it began rolling forward downhill, the front driver's side door was never opened.

30.

There is no digital or electronic record of any kind within the Subject Vehicle demonstrating or proving that the driver's side door was opened at any point during this time.

31.

There is no physical evidence of any kind on the Subject Vehicle demonstrating or proving that the driver's side door was opened at any point during this time.

32.

In fact, the evidence contained on or within the vehicle— physical, electronic, or digital—supports the fact that the driver's side door was not opened at any point during this time.

**No One Sat in the Driver's Seat**

33.

From the time that Mr. Ruff started the vehicle, until the time that it began rolling forward downhill, no one sat in the driver's seat.

34.

There is no digital or electronic record of any kind within the Subject Vehicle demonstrating or proving that someone sat in the driver's seat at any point during this time.

35.

There is no physical evidence of any kind on the Subject Vehicle demonstrating or proving that someone sat in the driver's seat at any point during this time.

36.

In fact, the evidence contained on or within the vehicle— physical, electronic, or digital—supports the fact that no one sat in the driver's seat at any point during this time.

## No One Depressed the Brake Pedal

37.

From the time that Mr. Ruff started the vehicle, until the time that it began rolling forward downhill, no one depressed the brake pedal.

38.

There is no digital or electronic record of any kind within the Subject Vehicle demonstrating or proving that someone depressed the brake pedal at any point during this time.

39.

There is no physical evidence of any kind on the Subject Vehicle demonstrating or proving that someone depressed the brake pedal at any point during this time.

40.

In fact, the evidence contained on or within the vehicle— physical, electronic, or digital—supports the fact that no one depressed the brake pedal at any point during this time.

**No One Depressed the Shift Lever Button**

41.

From the time that Mr. Ruff started the vehicle, until the time that it began rolling forward downhill, no one depressed the shift lever button.

42.

There is no digital or electronic record of any kind within the Subject Vehicle demonstrating or proving that someone depressed the shift lever button at any point during this time.

43.

There is no physical evidence of any kind on the Subject Vehicle demonstrating or proving that someone depressed the shift lever button at any point during this time.

44.

In fact, the evidence contained on or within the vehicle—physical, electronic, or digital—supports the fact that no one depressed the shift lever button at any point during this time.

**No One Maneuvered the Shift Lever Out of Park**

45.

From the time that Mr. Ruff started the vehicle, until the time that it began rolling forward downhill, no one maneuvered the shift lever out of Park.

46.

There is no digital or electronic record of any kind within the Subject Vehicle demonstrating or proving that the shift lever was maneuvered out of Park at any point during this time.

47.

There is no physical evidence of any kind on the Subject Vehicle demonstrating or proving that the shift lever was maneuvered out of Park at any point during this time.

48.

In fact, the evidence contained on or within the vehicle— physical, electronic, or digital—supports the fact that no one maneuvered the shift lever out of Park at any point during this time.

**Ford's Crash Data Confirms That the Vehicle Rolled While in Park**

49.

After the incident, both Plaintiffs and Ford downloaded the electronic crash data stored within the Subject Vehicle. That crash data confirms that the vehicle's transmission remained in the Park position while the vehicle rolled away.

**Pre-Crash Data -5 to 0 sec [2 samples/sec] (First Record) - Table 2 of 2**

| Time (sec) | Brake Powertrain Torque Request 1 | Brake Powertrain Torque Request 2 | Traction Control via Brakes | Wheel Torque (N-m) | Speed Control Status | Driver Gear Selection (Auto Trans) | Occupant Size Classification, Front Passenger (Child size Yes/No [Hex value]) |
|---|---|---|---|---|---|---|---|
| - 5.0 | No | No | No | 304 | Off | Park | No [$08] |
| - 4.5 | No | No | No | -20 | Off | Park | No [$08] |
| - 4.0 | No | No | No | -20 | Off | Park | No [$08] |
| - 3.5 | No | No | No | -20 | Off | Park | No [$08] |
| - 3.0 | No | No | No | -20 | Off | Park | No [$08] |
| - 2.5 | No | No | No | -20 | Off | Park | No [$08] |
| - 2.0 | No | No | No | -20 | Off | Park | No [$08] |
| - 1.5 | No | No | No | -20 | Off | Park | Yes [$02] |
| - 1.0 | No | No | No | -20 | Off | Park | Yes [$02] |
| - 0.5 | No | No | No | -20 | Off | Park | Yes [$02] |
| 0.0 | No | No | No | -20 | Off | Park | Yes [$02] |

50.

Ford inexplicably claimed that the above crash data proved that the vehicle was manually shifted out of Park, and then shifted back into Park—as the vehicle was rolling—more than 5.0 seconds before the impact.

51.

There is no eyewitness testimony that supports Ford's theory that the vehicle was manually shifted out of Park, and then shifted back into Park—as the vehicle

was rolling—more than 5.0 seconds before the impact.

52.

There is no data on the vehicle that proves Ford's theory that the vehicle was manually shifted out of Park, and then shifted back into Park—as the vehicle was rolling—more than 5.0 seconds before the impact.

53.

Any operator or passenger of the Subject Vehicle would have a reasonable expectation that if the Subject Vehicle's transmission was in Park and the vehicle had been at rest in the Park position for several hours, that the Subject Vehicle would not move and would remain in the Park position until such a time that the operator manually compresses the break pedal and uses the gear shift lever to put the Subject vehicle into Neutral, Reverse or Drive.

## FORD'S INCOMPLETE RECALLS FOR ROLLAWAY DEFECTS

### Ford Recall No. 18S09

54.

On April 4, 2018, Ford submitted a recall notice to the National Highway Traffic Safety Administration (NHTSA), now known as Ford Recall No. 18S09, and NHTSA Recall No. 18V-213.

55.

The recall related to various 2017-18 Ford vehicles with 10R80 10-speed transmissions—like the Subject Vehicle—including Ford F-150s that are substantially identical to the Subject Vehicle.

56.

Ford admits that it assembled the affected transmissions "incorrectly," and that "[o]n some of the affected vehicles, a roll pin attaching the park pawl rod guide cup to the transmission case was not installed. If the pin is missing, with repeated use, the transmission may eventually lose Park function even when the shifter and instrument panel display . . . indicate the vehicle is in Park. . . . [and] could result in unintended vehicle movement."

**Ford Recall No. 18S10**

57.

On that same day, Ford submitted a recall notice to the National Highway Traffic Safety Administration (NHTSA), now known as Ford Recall No. 18S10, and NHTSA Recall No. 18V-214.

58.

Ford issued this recall after examining a Ford F-150 rollaway incident that was brought to Ford's attention by a trial lawyer who was representing a person

who was injured when their truck rolled away while the vehicle was in Park.

59.

The recall related to various 2018 Ford vehicles with 10R80 10-speed transmissions—like the Subject Vehicle—including Ford F-150s that are substantially identical to the Subject Vehicle.

60.

Ford admits that "a clip that locks the gear shift cable to the transmission may not be fully seated. Over time, a partially seated or dislodged clip may allow the transmission to be in a gear state different than the gear shift position selected by the driver. This condition could allow the driver to move the shifter to Park . . . while the transmission gear may not be in Park, with no instrument panel warning message or warning chime when the driver's door is opened indicating the vehicle is not secured in Park. If the parking brake is not applied, this could result in unintended vehicle movement."

**Ford's Investigations Into Rollaway Incidents**

61.

Before issuing these recalls, Ford conducted an internal investigation relating to vehicles, including vehicles equipped with a 10R80 10-speed transmission, rolling away while the vehicles were in Park.

62.

During that investigation, Ford sought to analyze all relevant rollaway incidents known to it at that time, so that Ford could discern the similarities between them, with the hope of leading Ford to a, or the, root cause of these vehicles rolling away while in Park.

63.

During these investigations, Ford reviewed cases of vehicle rollaway where the aforementioned roll pin was present in the transmission, and the clip that locks the gear shift cable to the transmission was fully seated.

64.

In other words, Ford reviewed instances of rollaway in those investigations where the root cause was neither the roll pin issue (from Ford Recall No. 18S09) or the clip issue (from Ford Recall No. 18S10).

65.

In sum, Ford recognizes at least two distinct defects affecting the transmissions of 2018 Ford F-150s with 10-speed 10R80 transmissions that would allow defective vehicles to (1) indicate to the user that they are in Park when, in fact, they are not, and (2) move in an unintended manner despite representing that the vehicle is in Park.

66.

That is precisely what happened to Plaintiffs in the Subject Vehicle, yet Ford chose not to issue a recall for the defect that caused Plaintiffs' vehicle to roll away, causing them serious injuries.

## INJURIES AND COMPENSATORY DAMAGES

67.

As a proximate result of the Incident and the conduct of Defendant as described above, Plaintiffs suffered severe or permanent injuries including but not limited to:

(a)    Broken and dislocated left hip, requiring surgical intervention and repair;

(b)    Head trauma, lacerations, and scarring;

(c)    Pain and soreness in various extremities; and

(d)    The need for future medical treatment, follow-up, and therapy, including a necessary hip replacement operation.

68.

As a proximate result of the Incident and the conduct of Defendant as described above:

(a)    Plaintiffs suffered emotional trauma and mental anguish, and pain and suffering;

(b)    Amy Ruff was unable to work for a period of time and, as a result, suffered lost wages, in an amount to be proven at trial; and

(c)    The Subject vehicle was damaged to such an extent that the repair costs exceed its current market value, rendering it totaled.

## APPORTIONMENT OF FAULT

69.

Under Georgia law, defendants in civil cases may attempt to shift fault to other defendants, or other persons/entities who are not parties to the lawsuit. This is called apportionment.

70.

Although defendants can apportion fault to nonparties in any case, that apportionment will reduce the verdict (and judgment) against them only when the plaintiffs sue more than one defendant. *Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*, 312 Ga. 350, 351 (2021).

71.

If the plaintiffs sue only one defendant, that defendant may argue that fault should be apportioned to nonparties during the trial, and the jury may ultimately

apportion fault to those nonparties, but the single defendant will, itself, be liable for the entire amount of the verdict apportioned to those nonparties. *Id*.

72.

Since Plaintiffs here have sued only one defendant, the jury's nonparty apportionment in this case will not affect the Court's judgment, if any, against Ford, which will be liable for the entire amount of fault apportioned to any person or entity who is not a party to this case.

## COUNT I – STRICT LIABILITY

73.

Ford designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Subject Vehicle, and its components, including but not limited to, the transmission and all physical and electronic gearing and linkage thereto ("Transmission System").

74.

The Subject Vehicle was sold as a new product within 10 years of the filing of this action.

75.

The Subject Vehicle left Ford's control in the same or substantially similar condition as it was at the time and place of the Incident, with the exception of

ordinary wear and tear or aesthetic modifications that did not affect the Transmission or surrounding components in any way that would cause it to roll away while in Park.

76.

Ford had a legal duty to adequately design, inspect, test, manufacture, and assemble the transmission in the Subject Vehicle so that it would not malfunction in such a manner that the Subject Vehicle would lose park functioning while the truck was in Park, thereby subjecting occupants to danger, severe injuries, and death.

77.

Among other things, the Subject Vehicle is defective, unreasonably dangerous, and unsafe for foreseeable users and occupants in each of the following particulars:

(a)     Despite the transmission shift lever being placed in Park, and the instrument panel display indicating Park, the Subject Vehicle is not, in fact, in Park;

(b)     Despite the transmission shift lever being placed in Park, and the instrument panel display indicating Park, the Subject Vehicle can engage in "unintended . . . movement," meaning that it can roll down

a driveway and slam into a tree, among other things;

(c)    The Subject Vehicle can roll away while it is in Park, even without anyone in the driver's seat, without anyone depressing the brake pedal, without anyone depressing the shift lever button, and without anyone maneuvering the shift lever out of Park;

(d)    Ford defectively designed the Transmission System in such a way that the incident could occur without any alteration, modification, or misuse of the Subject Vehicle;

(e)    Ford failed to warn Plaintiffs that the Subject Vehicle contained these defects.

78.

The defective nature of the Subject Vehicle was the proximate cause of the injuries and damages sustained by Plaintiffs as set forth herein, thus rendering Ford strictly liable.

## COUNT II – NEGLIGENCE

79.

At all times relevant herein, Ford engaged in the business of designing, manufacturing, assembling, marketing, inspecting, testing, and/or selling (directly or through distributors) devices such as the Subject Vehicle, which are intended to

be used as passenger vehicles while carrying heavy loads in the truck bed.

80.

Ford marketed, tested, inspected, and/or supervised those who did so for Subject Vehicle generally. Ford has a duty to warn their customers, including Plaintiffs, of any dangerous condition, defect, or safety hazard that it knew or reasonably should have known about including, but not limited to, loss of park functioning. This duty to warn extends beyond the sale of the product to the customer and continues to this day.

81.

As the designer, manufacturer, marketer, inspector, testes, and/or sellers of the Subject Vehicle and/or its component parts, Ford owed a duty of care to Plaintiffs, and the consuming public in general, to ensure that the vehicles that they design, manufacture, and/or sell are safe and free from defects. Ford also had a duty to adequately warn owners and users of the Subject Vehicle, as well as the consuming public, about dangers of which they were or should have been aware of on the Subject Vehicle.

82.

Ford specifically marketed this product (and its components) as both durable and safe for its intended uses. The Subject Vehicle was designed to have a long

usable life and was intended to be used by people like Bradley and Amy Ruff to do precisely the types of things they were doing at the time of the incident: sitting in the parked vehicle waiting for the operator to get into the car and drive it.

83.

The Subject Vehicle was both unreasonably dangerous and defective at the time it was designed, fabricated, assembled, manufactured, tested, inspected, marketed, and sold because it was unsafe for its intended and reasonably foreseeable uses.

84.

Based upon the foregoing, Ford was negligent and was the factual cause of the injuries, harm, damages, and losses of Plaintiffs in that they:

(a)    Designed, manufactured, and/or sold the Subject Vehicle with a Transmission System that would represent the vehicle was in Park when, in fact, it was not;

(b)    Designed, manufactured, and/or sold the Subject Vehicle with a Transmission System that would roll away while the vehicle represented it was in Park;

(c)    Designed, manufactured, and/or sold the Subject Vehicle with a Transmission System that would at times stay parked when in Park,

and at other times—with no warning—cease being in Park and begin

rolling away;

(d)     Negligently represented and marketed the Subject Vehicle as being

safe and durable for its intended and reasonably foreseeable uses,

which was objectively untrue; and/or

(e)     Failed to warn Plaintiffs that the Subject Vehicle contained these

defects.

## COUNT III – PROPERTY DAMAGE

85.

Defendant Ford caused the incident to occur, resulting in damage to the

Subject Vehicle that cannot be repaired without the costs exceeding its current fair

market value, thus rendering it totaled.

86.

As a result, Ford is collectively liable for the full and fair market value of the

Subject Vehicle.

## COUNT IV – NEGLIGENT RECALL

87.

By engaging in NHTSA Recall Nos. 18V-213, and 18V-214, along with the

research and analysis that was required to identify those distinct defects in the

Transmission Systems that are the same or substantially similar to that of the Subject Vehicle, Ford assumed an affirmative duty to warn of defects that would or could lead to the same kind of rollaway incidents that occurred in this case.

88.

When Ford assumed the aforementioned duties, it was aware of rollaway incidents caused by its Transmission System that would or could lead to serious injury or death, just like the rollaway incident that occurred in this case.

89.

The Subject Vehicle contains, at minimum, design and/or manufacturing defects that caused it to (1) falsely represent it was in Park, and (2) roll freely down a decline while representing it was in Park.

90.

Inexplicably, Ford failed to (1) properly include the Subject Vehicle in its recall campaigns, or (2) failed to identify to Plaintiffs and the consuming public an entirely different defect that would cause such an incident – a third such defect. Or, Ford failed to do both.

## <u>COUNT V – PUNITIVE DAMAGES</u>

106.

Ford, through its conduct in designing, manufacturing, inspecting, testing, and selling the Subject Vehicle and its component parts, demonstrated gross neglect and an entire want of care evidencing a reckless indifference and conscious disregard to the consequences of their actions, which included an extreme degree of risk. Plaintiffs are entitled to an award of punitive damages to deter Ford from such conduct in the future.

107.

Despite Ford's actual or constructive knowledge of the dangerous defects in the Subject Vehicle, Ford did not adequately remedy or mitigate the problem so that innocent victims like Plaintiffs would not be injured, maimed, or killed.

108.

As a result of Ford's callous, wanton, and reckless conduct, and it conscious indifference to the safety and well-being of users of the Subject Vehicle, users of their vehicles that contain similar defects, and the consuming public in general, numerous victims have been, or will be, injured in similar incidents over time.

109.

There is clear and convincing evidence that Ford acted with such willful, wanton, conscious, and reckless indifference, which demonstrated an entire wanton of care for property and the safety and well-being of victims like those involved in the Incident and others so as to evidence a conscious indifference to the consequences of its acts, which included an extreme degree of risk. These actions demand and warrant an award of punitive damages against Ford that will punish it for the harm they have caused and that will deter them from similar future misconduct.

## PRAYER FOR RELIEF

110.

Plaintiffs for the following relief:

(a)     That they recover all legally compensable damages that were inflicted by Ford, which she suffered in the past and she will continue to suffer in the future, including but not limited to, compensation for physical pain, emotional distress, mental anguish, disfigurement, physical impairment, lost wages, medical expenses, property damage, and any additional damages;

(b)     That punitive damages be awarded against Ford in an amount

sufficient to punish it for the harm caused by its dangerous and

defective product, and to deter them from similar future misconduct;

(c)     That Plaintiffs recover pre-judgment and post-judgment interest as

allowed by applicable law;

(d)     That Plaintiffs recover their costs of suit;

(e)     That Ford pay Plaintiffs' attorneys' fees;

(f)     That Plaintiffs have a trial by jury; and

(g)     For such other and further relief as the Court deems just and proper.

Respectfully submitted this 29th day of March, 2022.

                                        **ASHBY | THELEN | LOWRY**

                                        _/s/ Drew Ashby_
445 Franklin Gateway, SE                Andrew S. Ashby
Marietta, Georgia 30067                 Georgia Bar No. 455020
Main: (404) 777-7771                    Maxwell K. Thelen
Fax:   (404) 777-7772                   Georgia Bar No. 311404
drew@atllaw.com                         Seth A. Lowry
max@atllaw.com                          Georgia Bar No. 867568
seth@atllaw.com


                                        **WEINSTEIN & BLACK**

                                        _/s/ Jason Black_
167 Lee Street                          Jason A. Black
Jefferson, Georgia 30549                Georgia Bar No. 827136
Main: (706) 387-8975
jason@wblegal.net

## **<u>CERTIFICATION</u>**

The undersigned counsel hereby certifies that this pleading complies with

the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.)